Even in the context of a hostage situation, ripping up a piece of plywood that was nailed down to a hole in the floor of his house was an unlawful search. The district court erred when it found exigent circumstances here because there was no emergency situation or probable cause to justify ripping up that flooring. However, the district court was correct in finding that the protective suite was overbroad because there was no reasonable articulable fact suggesting that someone in that hole could pose a danger to police. Can I ask you a quick question? A case that would seem to me to be relevant here, and I guess it's near and dear to my heart because I wrote it, but no one has cited it, I'm feeling a little spurned, Montanez v. Carvajal. Are you aware of that case? It's a relatively recent case from the 11th Circuit. It deals with exigent circumstances in an ongoing burglary situation. Was that the 1983 case, or? This was decided in 2018. If by 1983 you mean a date, you mean a statutory section. But it's decided recently, and it basically holds that exigent circumstances, specifically entry to ensure that there are no remaining victims in the scene of an ongoing or immediately concluded burglary, sort of passes the Fourth Amendment test, and it just seems pretty close here. I mean, it was evident that there was some hostage situation going on. It was evident that the guy was doing something with the floorboard, and the hole seemingly big enough to stash someone in. Why is that not good enough under Montanez? Well, it goes back to probable cause determination, and I think with Montanez, and you look back at Holloway, which is the circuit's case that kind of outlined the emergency aid exception in the first place, and that's what we're dealing with here, right? So you still have to have that probable cause, and that probable cause has to be, you know, considering the totality of the circumstances, that there's a fair probability for that fact. That is, that police reasonably believed that they could show under the totality that there were people in danger, or the possibility for people in danger in that hole. And we're talking about, you know, the probable cause here for that justification, not probable cause searching for evidence, right? It's the probable cause for the justification for the exigency, which is the potential for hostages. And so here, the lower court, as you mentioned, found two specific facts. One, that there had been a hostage situation, and two, that he had been doing something mysterious with the hole. And I think context of the facts is important here because we are dealing with the totality of the circumstances, right? And so here, you have a situation where police show up at Mr. Willie Cook's house at about 10.30 in the morning. They set up surveillance for about two hours. They see a car leave, come back, leave, and come back again, and they approach Ms. Clemons as she's getting out of the car, announce themselves as police officers. She takes off running, boards herself up, locks the door, creates the standoff situation at that point. Officers approach the door. They find out that in addition to Ms. Clemons there, Mr. Willie Cooks is inside, and two other additional individuals, Price and Mr. Johnson. Price and Johnson are the only two that we consider hostages here, and I say we technically consider them hostages because they're not traditionally what you think of when you hear that word. You know, this isn't a bank robbery or a kidnapping or something like this. These two individuals were at Mr. Cook's house when police showed up. They were walking freely throughout the whole standoff situation. Did the police know all this, though? I mean, the windows are blacked out, right? Yes, Your Honor. They had contact with Ms. Price and Mr. Johnson. They were talking through the door. They were talking through the window. In fact, they had phone conversations. Why were they out there in the first place? They were out there to get Cooks, weren't they? They were out there to get Mr. Cooks, Your Honor, yes, they were. Warned? They had an arrest warrant for, I believe, assault, Your Honor. But Ms. Price... A warrant for assault. That's correct. Yeah. Was it a deadly weapon or just plain application? I believe it was just assault, second Your Honor. But Ms. Price and Ms. Johnson, like I said, are communicating with police throughout the entirety of the standoff. In fact, and I think one of the most important... Well, isn't it quite obvious he doesn't want to be taken in? Yes, Your Honor. It was a four-hour standoff. Absolutely. Absolutely. But Ms. Price and Ms. Johnson, again, you know, if we're looking at the justification for the emergency aid, it's because of those hostages. That's what the district court found in its analysis that the main point it pointed to for probable cause was that there were hostages to begin with, right? So understanding what type of hostages we're dealing with, I think, is important. And here, you know, the most important fact is Ms. Price, the only reason we consider them hostages is because they wanted to leave and they couldn't because the front door was locked. At some point, Ms. Price exits the back door. She comes outside and talks to police and goes back in of her own free volition, right? And so I think it's important to consider that because these are traditional hostages. Did they know that there were maybe more than four people in the house? There was no information presented to officers. There is no testimony whatsoever that there were any more than four. In fact, two of the officers testified that they didn't believe there were any more than four. Now, the government made a big deal that there could be more than four, but you're talking about could... We don't know why she went back inside, do we? We don't. For example, somebody else, sometimes they let somebody out, keeping somebody else inside. And if you don't come back inside, something's going to happen. There was no testimony. No, I know. But we just don't know why she went back in. That's all I say. That's kind of strange, isn't it? He's in there armed. That's right. Well, they think that he's armed. They get some information that he may have. Well, he's got enough force in there to keep them bottled up. There was no testimony that he didn't keep them in by force. Again, he's letting... Well, he's got a bolt on the door. And it was Ms. Clemons that locked the door, Your Honor. Yeah, I understand. And that kind of blows... Do they know what her relationship is with Cooks? I believe... I can't remember if it's in the record, but there was some type of romantic relationship, I believe. But did they know that, though? I don't think the police on the scene knew that, Your Honor. So she just arrived. She's just a person. That's correct. And runs in. As soon as they announce, she runs inside. Runs inside and puts a bolt on. That's correct. That's correct. And I think what all of this boils down to is what the district court noted in its protective sweep analysis. It's that we're dealing with conceivability versus reasonableness, right? That while something's conceivable doesn't necessarily mean that it's reasonable under a Fourth Amendment review. And while it's certainly conceivable that additional hostages could be in that hole, there's not a single articulable fact that points to anybody on the ground believing or an objective belief now in support of the justification for removing flooring to go in there and search. It's just not a reasonable analysis. So I guess back to Montanez. In Montanez, we said the responding officer will have no real way of knowing whether he's Here, the evidence is at the very least sort of equivocal. The officer said, like, well, we knew that there were four. We weren't sure that there were more than four, but we really didn't know at that point. And it just seems like from a common sense perspective, what rationale is there for requiring the officers to leave that situation as it is? Hostage situation, hole in the floor, bolted up, big enough to stick hostages in, and I don't know, go find a magistrate, get a warrant, and come back. That just seems sort of crazy to me. Well, I think, Your Honor, they were certainly justified in looking in the immediate areas where a hostage could be, right? Just to sweep the house, going to the protective sweep analysis. But here, they did a little bit more than that. They ripped up a piece of plywood that was nailed down in the floor. Nailed down? Really? Not just nailed. It was screwed. That's correct, Your Honor. But it's secured. And that's kind of the point here. I don't think in Montanez, I mean, they don't do that. But how long did it take him to do that? He was doing that, well, during a standoff. You know, the record's not really clear on that. Heard the noise, did they not? They heard a drill, Your Honor. I understand. Yes. It's not really clear, you know, whether he put the hole in the wall. He needed time. That's correct. That's correct. Well, isn't that pretty inferable that it did need time? I wouldn't concede that, Your Honor. You know, I think going back to looking to whether or not it's reasonable belief that the hostages could have been in that house, we have to believe or you would have to believe to find that that Willie Lee Cooks at some point, you know, prior to police showing up that day at 1030 in the morning, right? Prior to his friends coming over to his house that morning, not knowing that the police are going to show up. Prior to all of that, for some unknown reason, he just goes out, kidnaps somebody, ties them up, throws them up and gags them so they can't make any noise, throws them up under his house for no reason. And that's what you have to believe under the totality to find probable cause here. It's just not reasonable. Again, it may be conceivable, but that's a big difference between conceivability and reasonableness. And that's why the district court got the probable cause determination wrong below. Now, the government also argued protective sweep and the district court below found that the protective sweep executed in this case while justified at its inception was overbroad because there were no reasonable articulable facts to support the conclusion that an additional assailant could be in that hole. And there were two separate sweeps here as well. Mr. Cooks was taken into custody and they did an initial 30-second cursory sweep to see if anybody else was in the house. They didn't find anybody. Then they go back in for three to five minutes and this is where they come in with a crowbar, opening up locked closets and pulling up that flooring and searching in the hole. Just so I'm clear as to sort of the scope of the dispute. You don't deny, I guess, that if the officers are reasonably validly in the crawl space that everything else is plain view, whatever? That's correct. The line is at the removal of the flooring, the entry into the crawl space. You know, the Bowie case outlines the sweep analysis and kind of gives you guidance on that scope that it has to be a cursory inspection that takes no longer than necessary to dispel the reasonable suspicion of danger. Here, there was no reasonable suspicion of danger. It is simply unreasonable to believe somebody locked down in a crawl space could have jumped up and surprised attacked them at any point. And in any event, Bowie says that it should take no longer than necessary to complete the arrest and leave the residence. Here, Mr. Cooks was clearly in custody at the time of the second sweep. There is some dispute of whether he was in custody at the first sweep and the district court found that it actually couldn't find if he was arrested inside or outside of the house. But I think under the second prong of Bowie, it's really irrelevant of where he was arrested because they didn't have those articulable facts. So we would ask for this court to affirm on the protective sweep decision and reverse the lower court's determination that there was probable cause supporting the emergency aid exception. Thank you. Mr. Billingsley. Good morning. May it please the Court. Michael Billingsley for the United States. It's well established the Fourth Amendment does not require police officers to delay in the course of an investigation. If to do so would gravely endanger the lives of themselves or the lives of other people. The test is whether officers reasonably could have perceived that delay would endanger their lives or the lives of others. This court's case in Holloway recognizes that endangerment of life falls squarely within the exception of expected circumstances. And with regard to the case Judge Newsom, you referred to, I apologize for not citing that, but that sounds like that's what these facts show. I mean, the police, the question is whether it was reasonable for them to go in the house to ensure, number one, whether there was anybody else that would be a danger to them. For one thing, they had evidence or had information that Mr. Cooks was armed and he wasn't arrested with a gun. The other thing, I mean, this is a four-hour standoff with police. Well, they knew he had a gun. My understanding is prior to the arrest, they knew he had a weapon in the house. Correct. When he had these people. That's correct, but he wasn't arrested with a gun. I understand. So, you know, the reasonable inference is that the gun is still in the home. But the district court, as has been noted, rejected, the district court found that the officers were justified in doing a protective sweep. We think that's entirely supported by the record, entirely supported by the facts. The court just found that the protective sweep was exceeded when they pulled up this hole in the ground. And we're perfectly satisfied with the court affirming on the basis of the district court's reasoning. We made the alternative argument, but we think the officers were justified in either case. And there was testimony from the officers that they went in, they were looking for people who were endangering themselves, other hostages, or could be a danger to police. So they did it on both grounds. Both grounds are justified, but I think the court would be completely justified in affirming on the basis of the district court. Protective sweep's a little tougher for you, right? Because protective sweep doesn't allow you to go looking for victims or hostages, only looking for people that pose a threat to the officers. And if the hatch is locked, screwed in, locked from the outside, it's sort of hard to imagine how a surprise attack is launched from within. Well, I would direct this court's attention to Government's Exhibit 2, which is a picture of the outside of the house. So the officers outside the house would have seen that this home had a crawlspace extended the length of the home. And what we noted in the brief was crawlspaces have an access point, typically, if it's a reasonable assumption that this crawlspace would have an access point. The access point to a crawlspace is not a makeshift hole covered by plywood in the middle of the home in the hallway. So the fact that there was another entrance exit to this point would justify them going in to make sure that there wasn't somebody who could launch an attack from the other access point. Does that, though, at all undermine the exigent circumstances rationale? I mean, I'm thinking now about my own house. We put an addition on the back of the house in a little den area. There is a crawlspace with a little flap, right? So I can get under there and check for raccoons or whatever. And if we had busted a hole in the floor, covered it over with plywood and stuffed people down there, wouldn't they just crawl out the side flap, right? I mean, so is there, I guess, in saying that sort of the surprise attack rationale survives for protective suite purposes, are you undermining the exigent circumstances that there could be hostages under there that couldn't otherwise escape, just go out the same flap that the surprise attackers would go out? You don't have hostages restrained, for one thing, with regarding to hostages, with regarding to another dangerous individual. I don't know that there's no record, no testimony in the record as to, that they knew where the other access point was. And the main thing in this case, and this distinguishes this case from Davis, and I think it's the most significant point, is that it's, whether you can conclude to a certainty, obviously probable cause doesn't require a certainty, far from it. But the thing that I think you conclude for a certainty is that this individual was motivated by the presence of the police outside his home to do something with the hole in the floor. That's what the hostages were saying, he's doing something with the hole in the floor. They could hear through the front door, power tools. How long had they been there before the noise commences? They had been there a couple hours before they approached, because they saw somebody come and leave. Yeah, they were away from the house. Right, right. So I think that the record would reflect, I don't want to say I'm certain about this, but they started hearing the noises commence after the door was barricaded and they couldn't get in. After the woman went in. Right. And so about four hours this was going on. And how long between the time she went in until it was over? About four hours. So he did the drilling during the four hours. Right, that's about how long the actual standoff occurred. Because she goes in, they realize that the door's barricaded, they can't get in. They find out there's people in there that are saying, we're being held against our will. He's armed. And that's when they call the SWAT team in. They try the negotiations. The other aspect of this is that towards the end when the negotiations break down, they deploy tear gas into the home. That's another hour before the individuals come out. And I think it's a reasonable inference that the reason the door was unbarricaded is because he's finished sealing someone or something in that floor that he did not want the police to find. I think that establishes the probable cause. The exigent circumstances for the purposes of the district court's analysis is the fact that there could have been a hostage in the floor. And as the district court concluded, a hostage should not have to wait. What basis in the record do you have to show there were more than four people? Well, the fact that there were people in the house. I don't think the officers have to assume that because they know there are at least  The officers have to make the assumptions that are most consistent with their safety and the safety of others. Right. But I'm looking at... Sergeant Watts testifies, quote, he did not have, quote, have any information whatsoever that there were more than four people were in the home. And Doremus, the officer testified, he knew there were four. And his belief that four were in the home never changed. And all four had come out before they started pulling up the crawl space. You also asked what the SWAT team were saying. They weren't sure how many people were in the house. And I think if you look at the R&R, the court, the magistrate judge found as a factual matter, they weren't sure how many people were in the house. That hasn't been disputed. The facts found in the R&R haven't been disputed. I mean, why? Did anybody go to get a warrant before they pulled up the crawl space? They did not. They did not. Yeah. I think that shows that they had a warrant to enter the home to execute. Oh, right. Arrest warrant. But I think that shows that they were not there. Their purpose was not to go looking for evidence in this home. That's established by that fact, the fact that they didn't go get a warrant so that they could search the home after they executed the arrest. And the second thing is, as the district court found, the timetable shows that they weren't searching the home. They were motivated by safety concerns, safety concerns for themselves and safety concerns for any other people that were in the home. And one other thing to answer your question, I mean, I think that the information that they're getting, that there are at least four people in the house are because of the voices they're hearing. And I think maybe one of the hostages said there were four people in the house. But even if you assume that hostage is being truthful, that doesn't – they may not know everything that's going on in the house. We don't know where they're being kept in the house. Officers can't see in the house. And if somebody's in a crawl space, if I go into somebody's home and I'm thinking how many people are here, I'm not going to know if somebody's in the crawl space. So it's just the officers in that kind of situation, chaotic situation where you have a dangerous man holding people hostage and he's doing this thing with the floor. And again, I think you could reach the conclusion that he's doing it obviously motivated by the fact that the police are outside. And when he's done, that's when the door becomes unbarricaded. The police in that situation have to act, like I said, whether officers reasonably could have perceived that delay and they were in danger of their lives or the lives of others. And so when they go in there quickly and they did the quick 30 seconds just to make sure there's nobody standing out in the open, I mean, I think he said that they had a right to go in there and look for hostages. Right? Other hostages. I think he said that this morning. So if they do that, they have a right to look anywhere a hostage might be. And certainly a hostage might be. So they can unlock anything, any closet, any crawl space, any place in the house without a search warrant? They can just start opening up everything? Well, they can't. And they did look in places where a hostage couldn't be. You couldn't find a hostage in a drawer. Right? So there's no evidence at all that they were doing a general search of the home. What they were searching for were, again, I know the district court rejected the idea that, well, just with regard to opening the floor, the district court rejected they were justified under protective search. But they were looking for people who could be a danger to them or people who are in danger themselves. And on these facts, that is completely... What's your best case, do you think, closest analogy to the facts here that would justify a search in a home without a warrant? Well, I would have said Holloway. Now I'd like to point to Judge Newsom's case. I have an answer. Because, you know, I really apologize for not finding that case, not citing that case, because it sounds like it would be informative and perhaps controlling. So I would point you to that case. You know what the facts of that case are? I don't. I don't. The fact that he said that officers were justified... You're speculating. Well, based upon the fact that he said the officers were entitled to go in and make sure there wasn't anybody else in the home. I mean, one thing is when you do these search warrants in a home and you're talking about protective sweeps, most of the time the question is whether police had a basis to determine whether there were other people in the home. There's no question there were other people in this home. There's no doubt about that. The question is how many. And so the question would be whether the officers were required to assume that there were only four people in the home. My recollection is they don't know anything about these people. That's right. At all. That's right. Why they're there or anything else. That's right. All they know is that they got four in there. There's a woman in there who barricaded the door. They don't know that either. And he's got a gun. Right. I actually think that this case may follow a fortiori from Montanez. In Montanez, the police interrupt what they think to be an ongoing burglary, detained two suspects outside the home. The court holds that they had no way of knowing, one way or the other, whether there might be additional victims inside. And given the value that the Fourth Amendment places on the preservation of human life, that the officers were justified in doing an exigent circumstances-based search of the house in places where hostages or victims could be found. There was no hostage situation there. It was an ongoing burglary. It seems to me that this case is more exigent than that case. I would agree with that based on that description. Because clearly there was a hostage situation here. And to your point, Judge Joe Flatt, they don't know. But again, they have to make the assumptions that are most basic. If they were members of the family or whatever. Right. They got cooks, as I understand it, and four strange people. Right. I mean, four unrelated people. And two that they know are claiming to be hostages. And they have to make the assumptions that are most consistent with protecting the safety of those people and themselves. I mean, that's perfectly reasonable. And I think the Holloway case, if you look at the language in Holloway, it talks about, let's see if I can find it real quick. The court stated that what justified the warrantless entry into that home? And I realize the facts are different. There were reports of shots fired. But was the possibility of a gunshot victim lying prostrate in the dwelling created at the SHC necessitating immediate search? The possibility that there was a hostage in the crawl space. And to say that you had to stop and go get a warrant with that being a reasonable possibility seems inconsistent with the reasonableness that is required under the Fourth Amendment. See, that's the close question. Is it a possibility if that's just speculation possible? Or has it got to be probable? I mean, you've got to have probable cause to search enclosed spaces within a home without a search warrant. Well, they definitely had probable cause to a reasonable officer to assume that he's doing something, placing contraband or someone in that hole because of the way he's acting. He's motivated by their presence. Again, when he's done, that's when the door becomes unbarricaded. Holloway says the possibility. I think that you have, you know, probability is not a certainty. It's just a fair probability. And the fact that there were other hostages in this home that he had kept, to the police knowledge, against their will with the use of a firearm makes it a fair probability that there might be another person in danger in the home. Didn't the record say that one of the hostages was asked who else was in the home? I believe that's right. That was one of the basis they concluded there were at least four people in the home. But again, to say there are at least four is not the same thing as saying there are only four. There's a big distinction in this kind of situation. It's fast-moving. It's chaotic. The police are doing the best they can. Again, I think this record shows extensively. I know subjective motivation is not relevant, but it shows what they were motivated by were the protections on themselves and others. They were not motivated by, excuse me, going in there and doing a general search. There's absolutely zero evidence that that's what they did or that's what they were doing. If there are no further questions, the government would respectfully request that this court affirm the judgment of the district court. Thank you. Mr. Tartt? I'd like to clear up a couple of factual things that I think are quite clear at this point. First, the drilling that the officers heard was at the inception of the standoff.  There's no evidence of that. No testimony that there was prolonged drilling or drilling going on throughout the four hours. I think that was important to bring up. Secondly, the government talked about motivation and repeatedly referred to that the officers on the ground were looking for additional suspect and hostages. Not a single officer that testified stated that they were looking for hostages. There was one question asked of an officer, could there be hostages in that hole? He said yes. In fact, they were asked in an exigent circumstance situation or doing a protective sweep, have you ever found additional hostages? To which he replied no. All of the testimony was that they were looking for additional assailants, that they were doing a protective sweep. There was not even much argument from the government below that this was an exigent circumstances because of the hostages. The court found that in its decision. Help me out with this a little bit. Doremus, I've gotten my notes, testified at the suppression hearing that he was looking for potential hostages and that the officers performed a three to five minute secondary sweep to check for possible hiding locations and potential hostages in the house. I think those were responses to questions, were they not, Your Honor? Perhaps. That he did not testify that the reason. I think his initial testimony, Doremus, which was the first one on the scene that approached Ms. Clemons, that his primary motivation was looking for additional assailants, not looking for hostages. Again, it was in response to a question, could there have been hostages there? To which he replied yes. I'd also like to talk about Montanez again. I believe we had read that case, Your Honor, and believed it was factually distinguishable here. One, in Montanez, you have somebody that sees an ongoing burglary or responding to an ongoing burglary. Here, you have police setting up surveillance at a house for two hours. They have a four hour standoff and then a subsequent search. They have the place surrounded for literally six hours watching not what's inside of the house, but at least what's coming and going. If we're going to believe again that hostages could have been in that hole, they were already in there for six to eight hours by the time the police made entry. It's a little bit different than an ongoing burglary where you have absolutely no facts what's going on but for that it's an ongoing burglar. Here, they had facts. They had information. They had talked to people on the ground repeatedly. They had seen hostages come inside and go outside. They had done research on Willie Lee Cooks before they went to the house. It's a little bit factually different from the Montanez case. Again, it all goes back to the difference between conceivability and research. What did they find out about Cooks before they got there? What did they find out about him? That he was a felon. They knew he was a felon. That's correct. They had a warrant for his arrest for assault. That's correct. Okay. Thank you, gentlemen.